### UNITED AMERICAN INSURANCE COMPANY

v.

### The UNITED STATES.

### No. 510-69.

United States Court of Claims.

Decided March 16, 1973.

As Amended on Rehearing June 1, 1973.

Vester T. Hughes, Jr., Dallas, Tex., of record, for plaintiff; Larry L. Bean, and W. John Glancy, Dallas, Tex., of counsel.

Theodore D. Peyser, Jr., Washington, D. C., with whom was Asst. Atty. Gen., Scott P. Crampton, for defendant; Michael H. Singer, Washington, D. C., of counsel.

Edward J. Schmuck, Bethesda, Md., for Lincoln National Life Ins. Co., amicus curiae; Willis B. Snell, James V. Heffernan, Francis M. Gregory, Jr., Washington, D. C., and Thomas G. Thornbury, Fort Wayne, Ind., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

### OPINION

KASHIWA, Judge, delivered the opinion of the court: *

* We have used material from the opinion of Trial Commissioner Mastin G. White, though we reach a contrary result.

This is a suit for the recovery of $209,827.83 which represents additional income taxes and interest paid for the 1961 through 1966 period pursuant to deficiencies that were assessed against the plaintiff by the Internal Revenue Service.[1] We hold that the plaintiff is entitled to recover.

The plaintiff is a life insurance company organized under the laws of the State of Texas, with its principal place of business located in Dallas, Texas. The plaintiff is qualified and licensed to do business in 49 states in Puerto Rico, in the District of Columbia, and in Canada.

This case involves nonparticipating insurance in the form of guaranteed renewal policies issued by the plaintiff. Such a policy is a health and accident insurance contract, or a health and accident insurance contract combined with a life insurance or annuity contract, which the plaintiff enters into with a policyholder and which cannot be canceled by the plaintiff during the life of the insured for any reason except the nonpayment of premiums but under which the plaintiff reserves the right under certain circumstances to adjust premium rates by class. A class of insureds may be defined as insureds having the same policy form, being of the same age, sex, and occupational risk classification, and sometimes also being located in a particular territorial region. In other words, so long as an insured pays the premiums when they become due under a guaranteed renewable insurance policy, the plaintiff is obligated to continue the policy in force during the life of the insured. The level premium stated in the policy will also continue subject to the proviso that it can be raised if the premium for the whole class can be raised.

The statute involved is the Life Insurance Company Income Tax Act of 1959, 73 Stat. 112, Internal Revenue Code of 1954, §§ 801–820, as amended.[2] Among other deductions which a life insurance company is allowed to take in determining its gain or loss for income tax purposes is that provided for by section 809(d)(5):

> An amount equal to 10 percent of the increase for the taxable year in the reserves for nonparticipating contracts or (if greater) an amount equal to 3 percent of the premiums for the taxable year * * * attributable to nonparticipating contracts * * * which are issued or renewed for periods of 5 years or more. * * * [Emphasis supplied.]

In preparing its income tax returns for the several years during the 1961–66 period, the plaintiff claimed deductions based on 3 percent of the premiums attributable to its nonparticipating insurance contracts, including its guaranteed renewable health and accident contracts. However, upon auditing the plaintiff's

1. The amount of the claim, the amount allowed, and the amount disallowed, by years, are as follows:

| Year ended December 31 | Claim amount | Allowed | Disallowed |
| --- | --- | --- | --- |
| 1961 | $11,953 | $314.08 | $11,638.92 |
| 1962 | 43,315 | 549.64 | 42,765.36 |
| 1963 | 26,084 | 911.56 | 25,172.44 |
| 1964 | 44,271 | 1,483.00 | 42,788.00 |
| 1965 | 38,277 | 97.86 | 38,179.14 |
| 1966 | 49,388 | 104.03 | 49,283.97 |
| Total | $213,288 | $3,460.17 | $209,827.83 |

2. See United States v. Atlas Ins. Co., 381 U.S. 233, 85 S.Ct. 1379, 14 L.Ed.2d 358 (1965), for a discussion of the 1959 Act.

returns, the Internal Revenue Service determined that the plaintiff was entitled to a deduction with respect to its guaranteed renewable policies only on the basis of 10 percent of the increase in reserves and could not properly utilize 3 percent of premiums for this purpose. The IRS thereupon assessed against the plaintiff the deficiencies and interest which provided the basis for the present litigation. The Government has admitted that if the policies are noncancellable (i. e., the premiums cannot be changed, even by class) and have five years or more to run to age 60, or a higher specified age, they are entitled to the 3 percent of premiums deduction. Rev.Rul. 65–237, 1965–2 Cum.Bull. 231.

In view of the Government's foregoing admission regarding noncancellable policies and since section 801(e) provides as follows:

Sec. 801. Definition of life insurance company.

\* \* \* \* \* \*

(e) Guaranteed renewable contracts.
For purposes of this part, guaranteed renewable life, health, and accident insurance shall be treated in the same manner as noncancellable life, health, and accident insurance.

it would seem that there should not be any serious question that guaranteed renewable insurance policies should also be entitled to the 3 percent of premiums deduction. In spite of the compelling language of section 801(e), the Government maintains that since the guaranteed renewable policies were not issued "for periods of 5 years or more," as the Government interprets the phrase, they may not be treated in the same manner as noncancellable policies for purposes of the 3 percent of premiums deduction. We must resolve this question by an analysis of the precise language of section 809(d)(5) and the regulations thereunder, a review of the types of policies involved, an investigation of the legislative history in granting the alternative 3 percent of premiums deduction, and, finally, an examination of the effect of section 801(e) which we have set out above. The Government's position is that if an insurer can change the premium rates during a five-year period, even if those rates can only be changed by class, then such a contract cannot be considered as issued or renewed for five years or more. The Government seizes upon certain language of the Senate Finance Committee Report, S.Rep.No.291, 86th Cong., 1st Sess., p. 55, U.S.Code & Admin.News p. 1575. (1959–2 Cum.Bull., p. 810), which was adopted by the following Treasury Regulation, as authority for its position:

\* \* \* The determination of whether a contract meets the 5-year requirement shall be made as of the date the contract is issued, or as of the date it is renewed, whichever is applicable. Thus, a 20-year nonparticipating endowment policy shall qualify for the deduction under section 809(d)(5), even though the insured subsequently dies at the end of the second year, since the policy is issued for a period of 5 years or more. *However, a 1-year renewable term contract shall not qualify, since as of the date it is issued (or of any renewal date) it is not issued (or renewed) for a period of 5 years or more.* In like manner, a policy originally issued for a 3-year period and subsequently renewed for an additional 3-year period shall not qualify. However, if this policy is renewed for a period of 5 years or more, the policy shall qualify for the deduction under section 809(d)(5) from the date it is renewed. Treas.Reg. § 1.809–5(a).(5)(iv) (1969) [Emphasis supplied].

The Government urges that the taxpayer's guaranteed renewable accident and health policies are too closely akin to one-year renewable term contracts, which are specifically precluded by the Regulation from the section 809(d)(5) alternative 3 percent deduction, to qualify for such a deduction. The Government has published this position in Rev. Rul. 65–237, 1965–2 Cum.Bull. 231. For all practical purposes, the Government's

position rests on the argument that the statement in the Senate Report that "1-year renewable term" contracts do not qualify for the 3 percent deduction has the effect of disqualifying for the deduction all contracts, such as guaranteed renewable contracts, which do not guarantee a premium rate for the full duration of the policy.

It is our view that the Government misinterprets the Senate Committee Report. There is not a single word in that Report to explain what policies, or types of policies, were intended to be covered by the words "1-year renewable term" contract. There is no suggestion whatever that the term was meant to encompass all policies on which the premium rate is not guaranteed.

In the trial of this case, an expert witness testified on the issue of what was meant by the words "1-year renewable term." We think that his uncontradicted testimony is very material. John H. Miller, an actuary with 32 years of experience in the insurance field, having done much work in the health and accident area, and a member of the Society of Actuaries, the Casualty Actuarial Society, and the American Academy of Actuaries, was the only expert witness called. The plaintiff put him on, his qualifications were not challenged, and defendant did not produce any witness to rebut his testimony. Mr. Miller testified that on the basis of his knowledge of the industry the phrase "1-year renewable term" contract is used only with reference to life insurance, but for the purpose of the issue herein, the rules are the same. Mr. Miller then explained two varieties of one-year renewable term life insurance contracts of which he was aware. In one form (form A for discussion herein) the company guarantees that it will continue the coverage in force upon timely payment of premiums, and the precise amount of premiums for each age is specified in the policy; in the other form (form B for discussion herein) the company guarantees that it will continue the coverage in force upon timely payment of premiums, and the amount of premiums will be determined by reference to the company's then current rate for the insured's age and class at each policy anniversary date. Taking Mr. Miller's definitions and applying the Government's argument that contracts which guarantee a premium rate for the full duration of the policy qualify for the 3 percent deduction, we are faced with the result of form A, one-year renewables qualifying. Such a contract is issued for five years or more as renewability is at the option of the insured. It even meets the test defendant is seeking to impose here in that it has stated, guaranteed rates.[3]

It is proper, then, to ask what was intended by the insertion of the "issued or renewed for * * * 5 years or more" requirement in section 809(d)(5) and what was intended to be covered by the phrase "1-year renewable term," as used in the Senate Report. As we have noted above, there is no explanation in the Senate Report as to the meaning of the latter phrase. There are such a variety of "1-year renewable term" policies, certain of which resemble non-cancellable policies, that the only reasonable definition is one which looks to duration of risk.[4] This court takes the view that

3. While the Government has not, in so many words, conceded that the form A "1-year renewable term" policy qualifies for the 3 percent of premiums deduction, the following language of its brief suggests that such a policy meets all the criteria under its test:

"A nonparticipating, noncancellable policy, *including that form of yearly renewable term policy which guarantees the premium rate at specified ages or intervals*, creates a greater loss potential to the insurer than a nonparticipating, guaranteed renewable policy. * * * The reason for this is that the guaranteed renewable policy permits the insurer to increase its rates by class, whereas noncancellable policies provide for a guaranteed premium." [Emphasis supplied.]

4. We note that at oral argument before this court, there was confusion on the part of both parties as to what a "1-year renewable term policy" was, in addition to the

the primary [5] reason for inserting the "issued or renewed for * * * 5 years or more" requirement in section 809(d)(5) was to prohibit from qualification those contracts under which the *insurer* has the right to terminate or cancel the insurance risk within the five-year period. Cancellable accident and health insurance policies are issued for a relatively short term, usually no more than one year. Typically, such contracts are renewable by the insured unless the company gives the insured advance notice in writing that it will not renew the policy at the contract anniversary date.[6] Thus, a cancellable accident and health insurance policy issued for a period of one year may be described accurately as a "1-year renewable term" policy which, as to each insured, is subject to cancellation by the company. The insurer is *not* free to cancel or refuse to renew a guaranteed renewable contract of the type we have before us.

We deem it of crucial significance that the Government, in its own Revenue Ruling, has indicated that a proscribed aspect of the one-year renewable term policies is the ability of the insurer to cancel:

> A "1-year renewable term contract" is ordinarily a contract which does not guarantee the rate of premium to be charged each year [this language of the Government does not disqualify form A "1-year renewable term" contracts, only the form B type], or a contract which requires some sort of annual application by the insured for renewal (*which is subject to rejection by the insurer*), so that, in effect, a new contract is entered into upon each renewal.
>
> The noncancellable health and accident contracts issued by *X* [the insurer] continue to force automatically to age 60 or over so long as the renewal premium set forth in the policy is paid when due. At age 60 (or later age stipulated for termination) *these policies revert to yearly renewable term contracts where consent of X is necessary to keep the policy in force.* Rev.Rul. 65–237, 1965–2 Cum.Bull., p. 232. [Emphasis supplied.]

It is clear that the reference in the Senate Report to a "1-year renewable term contract" as one which does not qualify for the 3 percent deduction was not intended to preclude the allowance of the 3 percent deduction for guaranteed renewable contracts. Under the provisions of the latter policies, one term of which is a stated level premium, the in-

---

greater question of whether a guaranteed renewable policy is sufficiently "akin" to it to require similar treatment. This is undoubtedly due to the variety of policies, having a wide range of terms, which could be categorized under the general phrase "1-year renewable."

5. We say "primary" because policies are written in a great variety of forms; and we do not intend that the successful passing of this test will automatically guarantee qualification for the 3 percent of premiums deduction. Guaranteed renewables, as will be shown *infra,* have other characteristics which confirm our conclusion that they were meant to be treated as "noncancellable" policies, and thereby to qualify.

6. "Noncancellable Disability Insurance, as Related to the Federal Taxation of Life Insurance Companies," a memorandum prepared by the Massachusetts Indemnity Insurance Co., Hearings Before a Sub-committee of the House Ways and Means Committee, "Taxation of Life Insurance Companies," 83rd Cong., 2d Sess., 403–404 (1954). Thus, for example, a typical *cancellable* accident and health insurance policy issued by the Lincoln National Life Insurance Company between 1951 and 1962 provides as follows:

"PRIVILEGE OF RENEWAL

"Unless the Company shall have delivered to the Insured or shall have mailed to his last address as shown by the records of the Company written notice of its decision not to renew the policy at least fifteen days prior to the expiration of the then current period for which the premium has been paid, this policy may be renewed for a further term equal to the Amount of Premium. This privilege of renewal shall cease upon payment of the premium for the Premium Period which will expire next preceding the insured's 65th birthday."

sured may unilaterally renew each year and thereby, on his own volition, keep the insurance in force for a period of five years or more. In addition, there are substantial restrictions on the raising of rates.

The Government next argues, as a theoretical foundation for its position that the legislative history of the Life Insurance Company Income Tax Act of 1959 reveals that the reason for the 3 percent deduction was to provide a "cushion" for inflated costs or increased morbidity. Thus, since the rates of the policies in issue can conceivably be raised by class, the reason for granting the normally more favorable 3 percent deduction disappears. We cannot agree with either the Government's reading of the legislative history or, for that matter, its reading of its own regulations.

The legislative history makes clear that Congress enacted section 809(d)(5) to eliminate what otherwise would be an inequality of tax treatment between stock and mutual insurance companies. In the case of mutual insurance companies, premiums are higher and include an amount normally returned to policyholders as dividends. Amounts of premiums normally returned to policyholders give a mutual insurance company an additional "cushion" with which to meet unexpectedly heavy claims or other contingencies. Stock insurance companies do not have this cushion available and hence must maintain relatively larger surplus and capital accounts. Therefore, to enable stock insurance companies to build up and maintain adequate surplus, a special deduction is allowed with respect to nonparticipating policies. The Senate Finance Committee Report gave the following explanation of this deduction:

> Policyholder dividends in part reflect the fact that mutual insurance is usually · written on a higher initial premium basis than nonparticipating insurance, and thus the premiums returned as policyholder dividends, in part, can be viewed as a return of redundant premium charges. However,

such amounts provide a "cushion" for mutual insurance companies which can be used to meet various contingencies. To have funds equivalent to a mutual company's redundant premiums, stock companies must maintain relatively larger surplus and capital accounts, and in their case the surplus generally must be provided out of taxable income. To compensate for this, the House bill allows a deduction for nonparticipating insurance equal to 10 percent of the increase in life insurance reserves attributable to nonparticipating life insurance (not including annuities). Your committee has recognized the validity of the reasons for providing such a deduction and has therefore continued it in your committee's version of the bill. However, basing this addition, as does the House bill, only upon additions to life insurance reserves does not take account of the mortality risk factor present in policies involving only small reserves. To overcome this deficiency, your committee's amendments provide that a special 3 percent deduction based on premiums is to apply, instead of the 10 percent deduction, where it results in a larger deduction. This is a deduction equal to 3 percent of the premiums for the current year attributable to nonparticipating policies (other than group or annuity contracts) issued or renewed for a period of 5 years or more. Senate Comm. on Finance, Life Insurance Company Income Tax Act of 1959, S.Rep.No.291, 86th Cong., 1st Sess. 22 U.S.Code Cong. & Admin.News, p. 159 (1959) (reprinted at 1959-2 Cum.Bull. 770, 786).

The Senate Finance Committee Report went on to describe the five-year requirement, and this description was adopted by Treas.Reg. § 1.809-5(a)(5)(iv), *supra*.

While it is true that the legislative purpose involved allowing a "cushion" when the insurer undertook a long-term risk, there is nothing in the above-quoted legislative history to indicate that the

scope of the phrase "1-year renewable term" was thought to encompass guaranteed renewable policies merely because there was not a fixed premium also guaranteed by the latter policy. The Report merely states that "1-year renewable term" policies cannot qualify since they are not issued for a period of five years or more. It is significant that the report looks to *duration of risk* and not to the insurer's limited ability to alter one aspect of the policy.

The guaranteed renewable policies in issue clearly involve long-term risks. They are issued for life and the insurer is required to keep the policy in force, save for the failure to pay premiums. Both noncancellable insurance (under which the premium cannot be changed and which the Government concedes is subject to the 3 percent deduction) and guaranteed renewable insurance do require the creation of reserves from premiums to cover the higher risks of later years.

Guaranteed renewable policies prescribe a level premium and there are substantial limitations on the ability of the insurer to increase these rates. Any change in the premiums of the guaranteed renewable policies is prospective and cannot be accomplisehd without some difficulty. In at least 27 states, guaranteed renewable policies must be renewed without a rate increase unless a proposed increase is approved by the state insurance authorities. This process, which we find to be difficult in some states and time consuming in most of the others, was required with respect to 80 percent of the guaranteed renewable policies which plaintiff had in force. In other states, business, economic, and other pressures, especially competition, may substantially restrain any rate change.[7]

Indeed, the Government has recognized, albeit in another context, that there is a virtual identity between the noncancellable and the guaranteed renewable policies:

Generally, the reserve in addition to the unearned premiums is necessary in the area of noncancellable health and accident policies because the policy is renewable at the sole option of the insured. If, in such a situation, the premium called for by the policy is at a level rate, it would have to be greater in the early years of the policy than the pure cost of insurance so that the excess may be accumulated, with interest, to offset the increase in mortality risks as the insureds get older. United Benefit Life Insurance Co. v. McCrory, [D.C.] 242 F.Supp. 845, at 849 (1965). Because hospital and medical expense benefit policies, renewable solely at the option of the insureds, involve not only increasing mortality risks as the insureds get older but also the uncertainty of the costs of medical care, the premiums for such policies do not necessarily remain level but may be increased at renewal. However, such increase in premium cannot be made with respect to an individual insured but only with respect to the class of which he is a part. *This affords a certain stability to the premium that, together with the security of the coverage, necessitates a reserve in addition to the unearned premiums similar to that required under the noncancellable level premium contracts.* For this reason guaranteed renewable health and accident policies, not cancellable by the insurance company and with respect to which a reserve in addition to the unearned premiums must be carried, is treated in the same manner as a noncancellable health and accident policy. See section 1.801–3(d) of the regulations. Rev.Rul. 71–367, 1971–2 Cum. Bull., p. 259. [Emphasis supplied.]

The case of Commissioner v. Pacific Mutual Life Ins. Co., 413 F.2d 55 (9th Cir. 1969), rev'g 48 T.C. 118 (1967),

---

**7.** It should be noted that during all the years in issue, plaintiff did not increase the premiums on its guaranteed renewable policies.

three judges dissenting, was decided favorably to the Government on this very issue. The Tax Court had held for the plaintiff, stressing, as we do, both the guaranteed renewability of the contracts as well as the very qualified nature of the right to change rates, and then only by class. The Tax Court made the following observation:

> While we do not question the fact that petitioner retained the right to alter renewal premiums on the contracts in question, we note, as set forth in our findings, *supra,* that *those contracts imposed substantial limitations on such premium changes. In addition and of greater significance in distinguishing petitioner's guaranteed renewable contracts from the 1-year renewable term contracts referred to in the above-quoted Senate committee report, is the fact that, under the former contracts, petitioner guaranteed the renewal of the policies and all their provisions for a period of 5 years or more.* Thus, the only way the term of petitioner's guaranteed renewable contracts could have been shortened to less than 5 years was for an insured to either voluntarily cancel his policy or fail to make timely premium payments thereon. Since these possibilities are within the exclusive control of the insured and exist not only with regard to petitioner's guaranteed renewable contracts but with virtually all insurance contracts "issued or renewed for a period of 5 years or more," we think the insurance contracts in question satisfy the statutory definition of section 809(d)(5) in that they are, in essence, "issued * * * for periods of 5 years or more." * * * 48 T.C. 118, 143–144. [Emphasis supplied.]

The plaintiff's position is further supported by a structural analysis of the Life Insurance Act of 1959 as a whole. Specifically the language of section 801(e) is clear authority for the plaintiff's view that guaranteed renewable policies are, along with noncancellable policies, entitled to the 3 percent of premiums alternative deduction. Section 801(e) reads as follows:

> *Guaranteed Renewable Contracts.—* For purposes of this part, guaranteed renewable life, health, and accident insurance shall be treated in the same manner as noncancellable life, health, and accident insurance.

It must initially be noted that section 801(e) is made applicable to *all* the provisions of Part I of Subchapter L of the Code. Part I consists of sections 801 through 820 and is entitled "Life Insurance companies." Part I, by definition, includes section 809(d)(5). Statutory drafters very frequently are called upon to expand or contract definitional sections; and the calibration, in the context of these sections relating to life insurance companies, is very keen. We cull the following examples to illustrate this calibration:

1. The definition of a life insurance company in section 801(a) is to apply "[f]or purposes of this subtitle," i. e., Code sections 1 through 1564.

2. Numerous sections and subsections in Part I of Subchapter L are introduced with the phrase "for purposes of this part." See, for example, the definition of "investment yield" under section 804(c). See also section 804(b) defining "gross investment income," and section 806(a) relating to certain changes in life insurance reserves.

3. Section 806(b) is applicable solely "for purposes of this subpart * * *." Section 810(d)(1) is also applicable solely "for purposes of this subpart * * *."

4. The term "distribution" is defined in section 815(f) solely "[f]or purposes of this section * * *."

5. Section 801(c) defines the term "total reserves" "[f]or purposes of subsection (a) * * *."

6. Section 804(a)(1) refers to a rule solely "[f]or purposes of the preceding sentence * * *."

The legislative drafters of Subpart L also used the technique of specifying exceptions to the broad sweep of expansive

language. This is demonstrated by section 818(c) which, in general, allows a life insurance company to elect to recompute its reserves for certain purposes. Section 818(c) specifically provides that it is to apply "[f]or purposes of this part (other than section 801) * * *." Congress obviously drafted this provision in this way because Congress intended that a company's life insurance reserves would be taken into account for purposes of section 801 without regard to a section 818(c) election.

In the context of the income taxation of underwriting profits of life insurance companies, it should be kept in mind that we are dealing with relatively recent legislation, the Life Insurance Company Income Tax Act of 1959, P.L. 86–69, 73 Stat. 112, Section 2. We are not dealing with those areas of the Code in which legislation by one Congress is layered upon legislation of another Congress. Rather, our attention is directed to two sections, 801(e) and 809(d)(5), which came into the Code at precisely the same time. If, as the Government contends, it was really the purpose of Congress to deny the favorable treatment to guaranteed renewable policies which was granted to noncancellable policies issued for five years or more, it would have been most logical for Congress to exclude section 809(d)(5) from the scope of section 801(e). This could easily have been accomplished by inserting the words "except for section 809(d)(5)" immediately after the word "part" in section 801(e). To leave the broad scope of section 801(e) while at the same time evolving the pattern of specificity which we have outlined, *supra,* leads us to the inescapable conclusion that Congress intended precisely what it said: guaranteed renewable policies should be treated in the same manner as noncancellable policies for the purposes of sections 801 through 820.[8]

The Government, however, argues that sections 801(e) and 809(d)(5) are not harmonious and urges that we adopt the following solution:

> * * * Congress impliedly adopted as part of Sec. 801(e) the requirement contained in the alternative deduction provision of Sec. 809(d)(5) that the contracts mentioned in Sec. 801(e) be issued or renewed for periods of five years or more. * * * Commissioner v. Pacific Mutual Ins. Co., 413 F.2d 55, 60 (9th Cir. 1969), rev'g 48 T.C. 118 (1967).

We disagree with the Government on this point. There is no real indication that section 801(e) was merely meant to insure that reserves for guaranteed renewable policies would be treated in the same manner as reserves for noncancellable policies, i. e., as life insurance reserves.[9] While one effect of section 801(e) certainly requires that reserves for guaranteed renewable policies be treated as life insurance reserves, we

---

8. It is a cardinal rule of statutory construction that " * * * [t]o the extent possible, violence should not ordinarily be done to the words chosen by the Congress. * * * " Crawford v. United States, 376 F.2d 266, 272, 179 Ct.Cl. 128, 138 (1967), cert. denied, 389 U.S. 1041, 88 S.Ct. 781, 19 L.Ed.2d 831 (1968). See also Flora v. United States, 357 U.S. 63, 65, 78 S.Ct. 1079, 2 L.Ed.2d 1165 (1958), aff'd on rehearing, 362 U.S. 145, 80 S.Ct. 630, 4 L.Ed. 2d 623 (1960).

9. The House Report language, upon which the Government bases its view, reads, in pertinent part:

"5. *Guaranteed renewable contracts.*— The bill provides that guaranteed renewable life, health, and accident insurance will be treated in the same manner as noncancelable life, health, and accident insurance. Reserves with respect to such insurance will, therefore, be treated in the same manner as life insurance reserves for purposes of computing taxable investment income and gains from operations. * * * By including such contracts specifically within life insurance reserves for the future, your committee intends no inferences to be drawn as to their tax treatment under prior law. H.Rep.No. 34, 86th Cong., 1st Sess., p. 18 (1959–2 Cum.Bull., p. 748)."

find nothing at all to indicate that this was the only effect of section 801(e). In fact, the broad brush wording of section 801(e) requires a conclusion precisely the opposite of the Government's. We note that the Treasury's own regulations confirm that reserves were not at all the exclusive area in which guaranteed renewable and noncancellable policies were to be treated in the same manner. Treas.Reg. § 1.801–3(d) provides, in part, that:

> (d) *Guaranteed renewable life, health, and accident insurance policy.* The term "guaranteed renewable life, health, and accident insurance policy" means a health and accident contract, or a health and accident contract combined with a life insurance or annuity contract, which is not cancellable by the company but under which the company reserves the right to adjust premium rates by classes in accordance with its experience under the type of policy involved, and with respect to which a reserve in addition to the unearned premiums (as defined in paragraph (e) of this section) must be carried to cover that obligation. Section 801(e) provides that such policies shall be treated in the same manner as noncancellable life, health, and accident insurance policies. For example, the age termination date requirements applicable to noncancellable health and accident insurance policies shall also apply to guaranteed renewable life, health, and accident insurance policies. * * *

No inconsistency between section 801(e) and section 809(d)(5) will arise unless the Government's inferences with respect to what Congress meant by "issued * * * for 5 years or more" are

adopted. Since we have chosen to view Congressional intent with respect to this phrase in terms of duration of risk, there is no necessity to adopt the Government's strained reading of section 801(e). The alternative 3 percent of premiums deduction was granted because the 10 percent of reserve increase deduction was not deemed to provide a sufficient "cushion." To receive this potential benefit, Congress required that only life, health, and accident policies involving a relatively long-term undertaking could qualify. It is clear, for instance, that if the plaintiff were to offer either noncancellable or guaranteed renewable policies issued for periods of less than five years, neither would qualify for the 3 percent deduction. We do not decide whether Congress has made a wise decision; nor do we decide whether Congress has been too munificent in qualifying guaranteed renewable policies issued for five years or more for the 3 percent of premiums deduction. That is not our function.[10] We are concerned here only with what Congress' intent was, not what it, perhaps, should have been. By this standard, we hold that the plaintiff is entitled to recover and judgment is entered accordingly with the amount thereof to be determined pursuant to Rule 131(c).

DAVIS, Judge (dissenting).

In this very close case, I would follow the Ninth Circuit (Commissioner v. Pacific Mutual Life Ins Co., 413 F.2d 55 (C.A.9, 1969)), the dissenting judges in the Tax Court (Pacific Mutual Life Ins. Co., 48 T.C. 118, 144–145 (1967)), Trial Commissioner White, and the Internal Revenue Service's ruling.

10. It is a cardinal principle of statutory construction that a statute clear on its face must be interpreted as it is written. The United States Supreme Court in Unexcelled Chemical Corp. v. United States, 345 U.S. 59, 64, 73 S.Ct. 580, 583, 97 L.Ed. 821 (1953), stated the rule as follows:

"* * * Arguments of policy are relevant when for example a statute has an hiatus that must be filled or there are ambiguities in the legislative language that must be resolved. But when Congress, though perhaps mistakenly or inadvertently, has used language which plainly brings a subject matter into a statute, its word is final—save for questions of constitutional power which have not even been intimated here."

In my view there "are ambiguities in the legislative language that must be resolved", and accordingly we should consider "arguments of policy" revealed in the search for the dominant Congressional purpose. *See* Unexcelled Chemical Corp. v. United States, 345 U.S. 59, 64, 73 S.Ct. 580, 97 L.Ed. 821 (1953). Neither section 809(d)(5) nor section 801(e) is absolutely clear by itself, and in combination they present substantial textual difficulties. We must look to the legislative history to construe and harmonize the provisions. I read that source, not as concentrating on the five-year period, but as attempting to help only those companies which cannot change their rates to build up additional surplus to protect against unexpected bad experience. As the dissenters in the Tax Court put it (48 T.C. at 144–145): "Although the legislative history fails to explain the reason for the requirement that the policy be issued for 5 years, it seems clear that the accumulation of increased surplus was necessary only when the insurance company was committed for a 5-year or longer period. If the company is free to adjust its rates at any time when its experience proves to be more unfavorable than expected, there is no need for allowing the tax-free build-up of increased surplus. In the case of noncancellable accident and health policies, the company cannot adjust its rates notwithstanding unfavorable experience. However, in the case of the guaranteed renewable policies involved herein, petitioner could alter its rate schedule. It could not increase the rates of an individual policyholder merely because he became an increased risk, but it could increase the rates for the class of policies if it became apparent that the risks for the whole class were greater than expected. * * * [S]ince the company is free to adjust its rate schedule, there is no reason to permit the tax-free accumulation of additional surplus to protect against unanticipated risks in connection with these guaranteed renew-

able policies * * *." On the same basis, Trial Commissioner White concluded that "there was a logical reason for Congress to give insurers the benefit of the Section 809(d)(5) alternative deduction based on 3 percent of the premiums received under noncancellable contracts, while withholding such benefit with respect to guaranteed renewable contracts" like those involved here.

From this standpoint, section 801(e) does not have to be construed as mandating inclusion of taxpayer's contracts under section 809(d)(5) even though they fail to meet the dominant purpose Congress had in mind. The language of section 801(e) is not so demanding. For one thing, we do not really know what Congress meant by "guaranteed renewable life, health, and accident insurance", or whether plaintiff's insurance agreements fall within the category Congress wanted to cover. And even if they are included, this would not be the first definitional section found to contain an implied exception to words which may appear all-embracing. On balance, I agree with the Ninth Circuit (413 F.2d at 60) and Commissioner White that, to avoid conflict between the specific purpose of section 809(d)(5) and the general words of section 801(e), the latter should not be understood as a wooden directive compelling treatment of these renewable policies "in the same manner" as noncancellable agreements in every instance, regardless of differentiating legislative policies.

Another factor influencing me is that this seems the type of narrow and close tax issue which can properly be left to resolution by Congress (in the previous Congress, one house did pass an alleviating measure), and particularly in that light I see insufficient basis for disagreeing with the court of appeals which has already spoken.

KUNZIG, Judge, concurs in the foregoing dissenting opinion.